# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ROBERT WITTEN, on behalf of CHASE WITTEN, a minor,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**KEVIN DUFFY, JOHN DOE, a Fictitious name, RICHARD ROE, a Fictitious name, and the TOWNSHIP OF PARSIPPANY-TROY HILLS,**<br><br>    **Defendants.** | 04-CV-2933 (WJM)<br><br><br>**OPINION** |

Alfred V. Gellene
35 West Main Street
Denville, New Jersey 07834
*Attorney for Plaintiff*

J. Andrew Kinsey
Florio, Perrucci & Steinhardt, LLC
235 Frost Avenue
Phillipsburg, New Jersey 08865
*Attorney for Defendants*

**MARTINI, U.S.D.J.:**

This matter comes before the Court on defendants Detective Kevin Duffy's and the Township of Parsippany-Troy Hills' motion for summary judgment seeking to dismiss plaintiff's complaint. There was no oral argument. Fed. R. Civ. P. 78. For the reasons stated below, defendants' motion is **GRANTED** and plaintiff's complaint is dismissed with prejudice in its entirety.

**BACKGROUND**

This civil rights and state law action arose out of an altercation that took place between Chase Witten ("Chase"), a sixteen year old juvenile at the time, and Detective Kevin Duffy ("Det. Duffy") on July 8, 2003.  On that date, Det. Duffy called Chase and asked if he would come to the Parsippany police station because he was investigating a fight that Chase was involved in the night before.  Chase voluntarily went to the police station to speak with Det. Duffy.  When he arrived at Det. Duffy's office, Det. Duffy began questioning him about the events of the previous night.  Chase told Det. Duffy that he got into a fight with another teenager, Justin Osipuk.  The fight resulted from the fact that Justin believed Chase had burglarized his house three weeks earlier.  Chase, who had been suspected of committing the crime, had been questioned earlier by Det. Duffy about the incident as part of the investigation.

At the beginning of the conversation, both individuals were standing near the doorway to Det. Duffy's office.  After Chase explained what he believed caused the fight, Det. Duffy invited Chase to sit on the couch in his office and Chase sat down.  Det. Duffy, meanwhile, took up a position opposite Chase, leaning back against the front of his desk.  At some point after the two had moved to their new positions, Det. Duffy stated that he had been informed that several individuals who were present during the fight allegedly overheard Chase admit to burglarizing the Osipuk house.  Chase denied having made such an admission, and said that he had already told Det. Duffy everything he knew about the burglary when he had been questioned earlier.  Up

2

until this point, Det. Duffy's demeanor was not aggressive, loud or agitated.  (*See* Chase Dep. at 21:7-12).  And it is at this point that the factual stories told by the litigants diverge.[1]

Plaintiff alleges that when he said he had told Det. Duffy everything he knew about the burglary, Det. Duffy called him a "f**kin' liar" and "punk kid."  (*Id.* at 17-21).  At that point, Chase pulled out a pack of cigarettes, put the butt of a cigarette between his lips and pulled out a book of matches with his right hand.  Before he could light the cigarette, Det. Duffy allegedly swung his left hand, open-handed, and knocked it out of Chase's mouth.  In the process, Det. Duffy's fingers "brushed" against Chase's face.  (*Id.* at 28:16-18).  Chase attempted to stand up to retrieve his cigarette when Det. Duffy pushed down on his right shoulder so that Chase sat back down on the couch.  Chase immediately began to stand up again while saying, "What the f**k is your problem, man?"  (*Id.* at 29:3-6).  According to Chase, Det. Duffy then put his right hand around Chase's neck and pushed him over the armrest of the couch so that Chase's head was directed towards the floor.  (*Id.* at 37:13-23).  Chase alleges that he could not breathe and that Det. Duffy's grip cut off the flow of blood to his head causing him to lose consciousness within ten seconds.  (*Id.*).

When Chase came to, he was allegedly sitting up straight on the couch.  He did not ask to leave, but instead continued to talk with Det. Duffy about the burglary for another five to ten minutes.  (*Id.* at 44:11-24).  The conversation remained civil and at some point Chase offered to aid Det. Duffy with his burglary investigation.  Chase left at the end of the conversation.

---

[1]Given the Court's obligation to view the evidence in the light most favorable to plaintiff, the nonmovant, the Court only sets forth those facts as alleged by plaintiff.  It is sufficient to say that Det. Duffy denies engaging in the conduct that follows.

After leaving the police station, Chase went to his house and called his father, Robert Witten ("Robert"), to tell him what happened.  Robert went home and allegedly observed slight bruising on his son's neck.  (*See* Robert Dep. at 20:10-14).  Later, Robert went to meet with Det. Duffy to ask him about the incident.  Robert recorded their conversation with Det. Duffy's permission.  Although Robert believed that Det. Duffy had choked his son, he did not immediately raise the issue with Det. Duffy.  Instead, they engaged in a rather extensive discussion about the Osipuk burglary and the fight Chase was involved in the previous night.  Eventually, Robert informed Det. Duffy of Chase's claim that he had been choked.  Det. Duffy denied that he had choked Chase.  Det. Duffy explained that after he removed the cigarette from Chase's mouth, Chase had gotten up from the couch and "bumped" into him.  (*Id.* at 28:17-29:2). Det. Duffy stated he responded by pushing Chase down with his hand on Chase's shoulders to restrain and calm him.  Det. Duffy showed Robert the police report he had generated regarding the incident, including its reference to the fact that "Chase banged his chest against mine."  (*Id.*, Ex. RW-1).  Shortly thereafter, the taped conversation ended.  Robert characterized the whole exchange as "a very pleasant conversation."  (*Id.* at 29:9-11).

On July 9, 2003, Chase's probation officer notified Chase and his father that Det. Duffy had filed aggravated assault charges against him and that Chase was required to appear in court in two days.  The case was eventually dismissed for reasons unknown.  (*See id.* at 63:3-14). After Robert filed a complaint with the Parisppany police department, Internal Affairs Captain Paul Philipps conducted an investigation of the incident.  After an eighteen-day investigation, he concluded that an assault by Det. Duffy did not occur.  Rather, he came to the conclusion that the information he uncovered during the investigation showed that Chase assaulted Det. Duffy and

that Det. Duffy responded in an appropriate manner to diffuse the situation.  (*See* 8/26/03

Investigation Report at 17).

In February 2004, Robert filed a five-count complaint alleging civil rights violations and

state law claims in a New Jersey state court.  Due to a delay in service of the summons and

complaint, Defendants timely removed the case to federal court in June 2004.  Defendants now

move for summary judgment seeking dismissal of the entire complaint.


# ANALYSIS

**A.     Summary Judgment Standard**

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  However, a court should grant

summary judgment only "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  The burden of showing that no genuine issue of material fact exists rests initially

on the moving party.  *Celotex*, 477 U.S. at 323.  A litigant may discharge this burden by exposing

"the absence of evidence to support the nonmoving party's case."  *Id.* at 325.  In evaluating a

summary judgment motion, a court must view all evidence in the light most favorable to the

nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986);

*Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Once the moving party has made a properly supported motion for summary judgment, the

burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine

5

issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

(1986).   The substantive law determines which facts are material.  *Anderson*, 477 U.S. at 248.

"Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment."  *Id.*  No issue for trial exists unless the

nonmoving party can demonstrate sufficient evidence favoring it such that a reasonable jury

could return a verdict in that party's favor.  *Id.* at 249.


**B.      Excessive Force**

Count Two of the complaint alleges that Det. Duffy deprived Chase of his constitutional

rights when he physically restrained Chase.  In order to establish a claim for excessive force,

plaintiff must show that: 1) a seizure occurred; and 2) it was unreasonable under the

circumstances.  *Mantz v. Chain*, 239 F. Supp. 2d 486, 498 (D.N.J. 2002).  Because plaintiff failed

to satisfy the second element of his excessive force claim, Count Two must be dismissed.

In resolving plaintiff's excessive force claim, the Court must determine whether Det.

Duffy's "actions [were] objectively reasonable in light of the facts and circumstances confronting

him, regardless of his underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397

(1989).  This determination is made from an "on-scene perspective," not through the use of

hindsight.  *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  Whether the force used in a particular

case is reasonable will depend on "the facts and circumstances of each particular case, including

the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of

the officers or others, and whether he is actively resisting or attempting to evade arrest by flight."

*Graham*, 490 U.S. at 396.

6

Even viewing the facts in the light most favorable to plaintiff, the facts and circumstances demonstrate that Det. Duffy's actions to restrain plaintiff were not unreasonable. Plaintiff had a past colored by incidences of violence and criminal activity. Det. Duffy had known Chase for several years, and knew of his history. Det. Duffy knew that Chase visited the police department several times a week to meet with a counselor because of his troubled past. Indeed, he first met Chase when investigating an accusation that Chase brought a knife to his middle school. (*See* Chase Dep. at 11:23-12:1). He met with Chase again when investigating the Osipuk burglary, an investigation in which Chase was a suspect. Det. Duffy questioned Chase about that burglary approximately three weeks before the incident in question. And their meeting on July 8 was part of Det. Duffy's investigation regarding a fistfight that occurred the night before in which Chase and at least three other teenage boys were involved.

When Det. Duffy stopped plaintiff from smoking and prevented him from retrieving his cigarette, plaintiff attempted to stand up again while saying, "What the f**k is your problem, man?" (*See* Chase Dep. at 31:7-9). Given plaintiff's proximity to defendant, his movement toward defendant, his challenging words, and his history of violence, Det. Duffy believed that plaintiff posed as an immediate and hostile threat.[2] As the Supreme Court has noted, "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular

_____

[2]Plaintiff never addresses how Det. Duffy, or a reasonable officer, could have perceived Chase's reaction to being pushed down on the couch when he attempted to retrieve his cigarette. Instead, plaintiff baldly concludes that if this Court accepts plaintiff's version of the facts as true, the Court must conclude that Chase did not assault Det. Duffy. Plaintiff, however, is incorrect. As recounted above, plaintiff's facts demonstrate that a reasonable officer in Det. Duffy's shoes could have believed, as Det. Duffy believed, that Chase was a threat to his or her safety.

situation." *Saucier*, 533 U.S. at 205 (quoting *Graham*, 490 U.S. at 397).  In view of these tense

and uncertain circumstances, Det. Duffy took reasonable steps to diffuse the situation.  Although

Chase alleges that Det. Duffy choked him, causing him to lose consciousness, the Court does not

believe Det. Duffy's response, when examined under the totality of the circumstances, is

indicative of unreasonable force; rather, Det. Duffy employed a measured response to subdue

Chase and return the discussion to a civil tone.  Det. Duffy's use of force lasted no more than ten

seconds.  Chase suffered no injuries except for some alleged minor bruising of his lower neck.

And Chase never sought medical attention for any injuries.  Although Chase may argue that Det.

Duffy's actions were unnecessary despite Chase's sudden, aggressive attitude, that does not

establish that Det. Duffy's corrective actions were unreasonable.  *See Graham*, 490 U.S. at 396

("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers, violates the Fourth Amendment."); *see also Saucier*, 533 U.S. at 205 ("If an officer

reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the

officer would be justified in using more force than in fact was needed.").

      Further, Det. Duffy's use of force diffused the potentially explosive situation and returned

their conversation to a civil tone.  Despite the altercation, Chase did not ask to leave.  Instead, he

admits that he remained seated on the couch and continued to discuss the burglary of the Osipuck

house for another five to ten minutes.  He even volunteered to help Det. Duffy out with his

investigation before leaving Det. Duffy's office.  Consequently, no reasonable factfinder could

conclude that Det. Duffy's use of force was unreasonable under the circumstances.

**C.      Malicious Prosecution**[3]

Count Three alleges that Det. Duffy filed "false charges" against plaintiff.  (*See* Compl.,

Count Three, ¶ 6).  Defendants move for summary judgment characterizing plaintiff's claim as

one alleging malicious prosecution.  Plaintiff does not dispute that characterization.

Consequently, the Court will treat Count Three as asserting a claim for malicious prosecution.

To establish a common law claim for malicious prosecution, a plaintiff must demonstrate

four elements: "(1) that the criminal action was instituted by the defendant against the plaintiff,

(2) that it was actuated by malice, (3) that there was an absence of probable cause for the

proceeding, and (4) that it was terminated favorably to the plaintiff."  *Lind v. Schmid*, 337 A.2d

365, 368 (1975).  Failure to establish any one of these elements warrants dismissal of the claim.

*Id.*  To establish a malicious prosecution claim under § 1983, a plaintiff must demonstrate those

four elements plus a fifth element: (5) "the plaintiff suffered a deprivation of liberty consistent

with the concept of seizure as a consequence of a legal proceeding."  *Estate of Smith v. Marasco*,

318 F.3d 497, 521 (3d Cir. 2003).  Because plaintiff cannot establish the elements of his

malicious prosecution claims, Count Three must be dismissed.

First, plaintiff cannot establish that Det. Duffy acted without probable cause when he

filed charges against Chase.  Under New Jersey law, a person commits simple assault when he

"[a]ttempts by physical menace to put another in fear of imminent serious bodily injury."

---

[3]Defendants appear to assume that plaintiff alleges a malicious prosecution claim under § 1983.  Although this Court believes a more accurate reading of the complaint reveals that plaintiff's malicious prosecution claim is only stated as a state tort claim, see Count Three, because plaintiff's allegations are decidedly intertwined and vague, the Court will consider them to suggest a malicious prosecution claim under § 1983 as well.  For the very same reason, the Court will consider plaintiff's failure to train properly claim, set forth in Count Five, as alleging claims under both § 1983 and state law.

N.J.S.A. 2C:12-1(a)(3).  A simple assault is elevated to the level of "aggravated assault" when the act is committed against a police officer acting within the scope of his duties.  N.J.S.A. 2C:12-1(b)(5)(A).  As set forth above, in light of the facts and circumstances surrounding the confrontation between Chase and Det. Duffy, a reasonable office could have believed that Chase was threatening him or her.  Accordingly, the facts demonstrate Chase attempted to menace Det. Duffy.  And because that occurred when Det. Duffy was conducting an investigation, an activity that falls within his duties, the facts show that Det. Duffy had probable cause for filing the aggravated assault charge against Chase.

Second, plaintiff has also failed to carry his burden of proof with regard to actual malice. Defendant proffered evidence that it was Chase's parole officer who encouraged Det. Duffy to file the charges, not Det. Duffy acting out of any malicious intent.  (*See* 8/26/03 Investigation Report at 11).  Indeed, Det. Duffy was reluctant to file charges until he was informed that Chase had been incarcerated for ten days in a juvenile center over a physical altercation with a staff member at his high school that involved "bumping," and had just been released the week before July 8.  Plaintiff offers no evidence to the contrary.  Consequently, given this record, no reasonable factfinder could find that Det. Duffy acted with actual malice.

Lastly, with regard to plaintiff's § 1983 malicious prosecution claim, plaintiff cannot show that he suffered a deprivation of liberty consistent with a Fourth Amendment seizure.  A summons requiring a person to appear in court does not rise to the level of a Fourth Amendment seizure. *See Mantz*, 239 F. Supp. 2d at 503 ("[T]he issuance of a summons requiring a criminal defendant to appear in court on a specific date does not, by itself, amount to a 'seizure' under the Fourth Amendment.").  Here, the only evidence that Chase can identify that could amount to a

10

seizure after legal proceedings began is a summons for him to appear in court.  He was not arrested, nor was he required to post bail.  Consequently, plaintiff cannot show that he was "seized" under the Fourth Amendment.

In sum, because plaintiff cannot establish several elements of his malicious prosecution claims, he cannot maintain these claims.  Therefore, summary judgment is granted in defendant's favor and Count Three is dismissed.


**D.      Qualified Immunity and State Law Immunity**

In moving for summary judgment on plaintiff's civil rights claims under § 1983, Det. Duffy argues that he is entitled to qualified immunity.  Because the Court agrees with defendant, summary judgment is granted in his favor.

Under the doctrine of qualified immunity, police officers, as public officials performing discretionary duties within the scope of their employment, are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The privilege is more than a defense to liability, it is an immunity from suit. *Saucier*, 533 U.S. at 200-01 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  In determining whether an officer is immune from suit, a court must first inquire whether "the facts alleged show the officer's conduct violated a constitutional right".  *Id.* at 201.  If plaintiff fails to establish that a constitutional right was violated, the inquiry ends and the officer is entitled to immunity.  *Id.*  If, however, a violation could be ascertained when the facts are viewed in the light most favorable to the party asserting the injury, a court must then inquire whether the right

was "clearly established" at the time of the officer's allegedly unlawful conduct.  *Id.*  In making

that determination, the relevant inquiry is "whether it would be clear to a reasonable officer that

his conduct was unlawful in the situation he confronted."  *Id.* at 202.  Put differently, "[i]f the

law did not put the officer on notice that his conduct would be clearly unlawful, summary

judgment based on qualified immunity is appropriate."  *Id.*  "The qualified immunity standard

'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or

those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citations

omitted).

Having already found that Det. Duffy's use of force was reasonable under the facts and

circumstances presented, the Court finds that he is entitled to immunity for all alleged

constitutional violations arising out of the incident.  However, even assuming for the sake of

argument that the use of force constituted an unreasonable seizure under the Fourth Amendment,

the Court concludes that Det. Duffy remains entitled to qualified immunity.  A reasonable officer

in Det. Duffy's place could have believed the force used to restrain plaintiff was lawful in this

particular situation.

It appears that plaintiff essentially takes issue with that conclusion by arguing that

choking cannot be believed to be lawful when there is no provocation by the allegedly injured

party.  (*See* Pl.'s Opp'n Br. at 12).  But, as discussed above, that argument is fundamentally

flawed because the facts show there was provocation.  Plaintiff admits that he attempted to stand

up immediately after Det. Duffy pushed him down on the couch.  He also admits that while

attempting to stand he said, "What the f**k is your problem, man?"  These facts coupled with his

history of violence and his close proximity to Det. Duffy provided Det. Duffy with ample reason

to believe that plaintiff posed an immediate threat to his safety.  As a result, Det. Duffy was justified in using force to diffuse the situation.

Although plaintiff may take issue with the amount of force used, qualified immunity exists to "protect officers from the sometimes 'hazy border between excessive and acceptable force".  *Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000)).  "Police officers 'who reasonably but mistakenly conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity.'"  *Luthe v. City of Cape May*, 49 F. Supp. 2d 380, 389 (D.N.J. 1999) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997)).  Here, the altercation between Chase and Det. Duffy unfolded quickly. Det. Duffy did not know the full extent of the threat posed by Chase, but he had to make a split-second decision on how to resolve the situation.  Under the facts as alleged by plaintiff, Det. Duffy took immediate action that lasted at most ten seconds and did not injure plaintiff except for some minor bruising.  A reasonable officer in the same situation could have believed that pacifying plaintiff as Det. Duffy did was an appropriate and lawful response.  In other words, Det. Duffy did not act incompetently or knowingly violate the law.  Accordingly, Det. Duffy is entitled to qualified immunity.

Moreover, Det. Duffy is entitled to immunity under New Jersey law as to the state law claims alleged in Counts One, Three and Four.  Under the New Jersey Tort Claims Act ("TCA"), a public employee who acted "in good faith in the execution or enforcement of any law" is entitled to immunity.  *See* N.J.S.A. § 59:3-3.  The same "objective reasonableness" standard used to determine qualified immunity is used to resolve the inquiry of "good faith" under N.J.S.A. § 59:3-3.  *Mantz*, 239 F. Supp. 2d at 508.  Therefore, having found that Det. Duffy's actions were

13

objectively reasonable entitling him to qualified immunity, the Court concludes that Det. Duffy's actions were in "good faith," shielding him from liability under the TCA.  Consequently, all claims against Det. Duffy are dismissed.


**E.      Municipal Entity Liability**

Plaintiff alleges that the Township of Parsippany-Troy Hills is liable for failing to properly train and supervise its police officers.  (*See* Compl., Fifth Count, ¶ 1).  Municipal entities may be sued under § 1983 only for acts implementing an official policy, practice, or custom.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978).  A plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered.  *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984).  A course of conduct is considered to be a custom when, though not authorized by law, such practices, known of and acquiesced in by a policy maker, are so permanent and well-settled as to virtually constitute law.  *See Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  Even assuming there is evidence of a constitutional violation, the civil rights claim against the Township must be dismissed because there is no basis for extending municipal liability in this case.

Plaintiff argues that the Township's failure to properly define the term "interrogation" in its police manual "led directly to the circumstances that created a risk of injury to the juvenile in this case."  (Pl.'s Opp'n Br. at 8).  Plaintiff asserts that if the term was properly defined, Det. Duffy would have been required to question Chase in the presence of his parents.  Plaintiff maintains that the purpose of the regulation is to "protect juveniles from improper questioning."

14

(Pl.'s Br. at 9).  Even assuming plaintiff's argument is correct, and the term "interrogation" is vaguely defined in the police department's manual, plaintiff's argument is unavailing.

"Where . . . the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (citation omitted).  To make this showing of deliberate indifference, there must be some evidence that: "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  *Id*. (footnote omitted). Plaintiff simply has not produced any evidence to carry his burden.

Even assuming that elements one and two are met – that municipal policymakers know that police officers will interrogate juveniles without the presence of parents – there is no evidence that such unsupervised questioning will "frequently" result in the use of alleged excessive force.  Indeed, as alleged, there is only one incident of record where a juvenile was questioned without the presence of parents and excessive force was used: that being the incident between Det. Duffy and Chase.  Because a single incident cannot establish frequent deprivation of constitutional rights, plaintiff's claim against the Township must be denied.  Therefore, the Court grants summary judgment in favor the Township.

15

**F.      The State Law Claims Alleged in Counts Four and Five**[4]

Defendants moves for summary judgment on Counts Four and Five for failure to satisfy

the requirements of the TCA.  Counts Four and Five allege tort claims, specifically, negligent

infliction of bodily injury and negligent training and supervision of police officers by the

Township, respectively.  Accordingly, these claims are governed by the TCA.

Defendants argue that these state law claims fail to satisfy the "verbal threshold

requirement" of the TCA.  The "verbal threshold requirement" is the section of the TCA that

provides that "[n]o damages shall be awarded against a public entity or public employee for pain

and suffering resulting from any injury; provided, however, that this limitation on the recovery of

damages for pain and suffering shall not apply in cases of permanent loss of a bodily function,

permanent disfigurement or dismemberment where the medical treatment expenses are in excess

of $3,600.00."  N.J.S.A. 59:9-2(d); *see DelaCruz v. Borough of Hillsdale*, 870 A.2d 259, 268

(N.J. 2005).  Essentially, the verbal threshold allows recovery for economic or consequential

damages while limiting claims for pain and suffering.  *See DelaCruz*, 870 A.2d at 268.

Here, there is no dispute that plaintiff does not claim economic or consequential damages.

Rather, his alleged injuries are confined to the pain and suffering he allegedly suffered as a result

of Det. Duffy's actions.  As stated above, plaintiff suffered only minor bruising from the incident

and never sought medical attention for any alleged injuries.  Plaintiff does not dispute that these

injuries do not fall within the category of "permanent loss of bodily function, permanent

---

[4]Plaintiff's state law claims alleged in Counts One (intentional infliction of emotional and
physical pain and suffering) and Three (filing of false charges) have previously been dismissed
and need not be addressed in this section.  Instead, this section is meant to provide an alternative
basis for dismissing the state law claims set forth in Counts Four and Five.

disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600." Consequently, summary judgment is granted in favor of defendants, and the state law claims in Counts Four and Five are dismissed.

## CONCLUSION

For the aforementioned reasons, the Court concludes that Det. Duffy is entitled to qualified immunity from plaintiff's § 1983 claims, as well as immunity from plaintiff's state law claims.  The Court further concludes that plaintiff has failed to establish municipal entity liability and the claims for excessive force and malicious prosecution.  Moreover, plaintiff's negligence state law claims fail to satisfy the requirements of the verbal threshold imposed by the Tort Claims Act.  Accordingly, defendants' motion for summary judgment is granted and plaintiff's complaint is dismissed in its entirety.

**Dated:** October 28, 2005                                   s/ William J. Martini
                                                              **William J. Martini, U.S.D.J.**

17